Elizabeth C. Pritzker (CA SBN: 146267)
Jonathan K. Levine (CA SBN:  220289)
Bethany Caracuzzo (CA SBN: 190687)
Caroline C. Corbitt (CA SBN: 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
E-mail: ecp@pritzkerlevine.com; jkl@pritzkerlevine.com
         bc@pritzkerlevine.com; ccc@pritzkerlevine.com

Heidi M. Silton (*pro hac vice* forthcoming)
Justin R. Erickson (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
E-mail: hmsilton@locklaw.com; jrerickson@locklaw.com

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL CARROLL, DANIEL EGERTER, and BRENDA KEEGAN, and individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

-1-

Plaintiffs Daniel Carroll, Daniel Egerter and Brenda Keegan, on behalf of themselves and all others similarly situated, bring this class action against Defendants Google LLC; Google Ireland Ltd.; Google Commerce Ltd.; Google Asia Pacific Pte. Ltd; and Google Payment Corp. (collectively, "Google" or "Defendants"), and alleges as follows:

## INTRODUCTION

1.      Smart mobile devices are ubiquitous in modern day life. Over 80 percent of Americans own a smartphone, an increase of more than 40 percent over the past decade.[1] Approximately 50 percent of Americans own tablet computers.[2]  For an increasing portion of people, smart mobile devices are their primary access to the internet. One-in-five Americans accesses the internet through a smartphone, but does not have traditional internet service at home.[3]

2.      Consumers use smart mobile devices for many reasons. Three-quarters of Americans use their smartphone to browse the internet. Nearly 70 percent use them to send and receive e-mail. Others use their smartphone to access social media sites, play games, keep track of their calendar, edit photos, navigate traffic, stay up-to-date on the news, and shop.[4] In short, these devices are integral to all aspects of life.

3.      Like an ordinary desktop computer, smart mobile devices rely on an operating system ("OS") to function. Mobile OSs come pre-installed on tablets and smartphones. The two most popular mobile OSs are Google's Android and Apple's iOS. Because the Apple iOS runs only on devices that Apple manufactures, the Android is the dominant mobile OS for all other manufacturers, including Samsung, LG, and Motorola.

4.      Mobile applications ("apps") are the most common way by which consumers use their smart mobile devices. Apps are a type of software specifically customized for use on a smart mobile

---

[1] *Mobile Fact Sheet*, Pew Research Center (June 12, 2019), https://www.pewresearch.org/internet/fact-sheet/mobile/.
[2] *Id.*
[3] *Id.*
[4] *Which kind of smartphone apps do you use regularly*, Statista, (May 2020), https://www.statista.com/forecasts/997191/smartphone-app-usage-by-type-in-the-us.

device. In order for an app to function on a smart mobile device, it must be compatible with that device's operating system.

5.     Consumers access mobile applications in several ways. Some applications come pre-installed on their devices. Consumers can download others from an app store. Others can be downloaded directly from the internet, through a process called sideloading.

6.     The overwhelming majority of applications are downloaded through an app store. For devices that use the Android OS, the dominant app store is the Google Play Store, which has more than 2.56 million apps available for download or purchase. Over 90 percent of apps downloaded or purchased from on an Android device come from the Google Play Store.

7.     In theory, consumers have more options than the Google Play Store available to them. Other companies, including Samsung and Amazon, have developed their own app stores. Some app developers make their products available to download directly from a website. This competition should lower costs and lead to greater innovation and efficiency.

8.     In reality, however, the opposite has happened. Google, using its control of the Android OS, has taken a series of steps to make it nearly impossible for a consumer with a device that has a licensable smart mobile OS to purchase an app from any platform other than the Google Play Store. As a result, Google now has been able to maintain a monopoly over the market for the distribution of apps compatible with licensable smart mobile OSs.

9.     Google maintains its monopoly through a series of contracts with device manufacturers and app developers, and by imposing technological restrictions that make it nearly impossible for consumers to locate alternate ways to download apps. Google requires that device manufacturers give the Google Play Store preferential treatment in order to use the Android trademark, Google's proprietary apps, including Gmail, Google Maps, and YouTube, and Google Play Services, software that is necessary to keep apps running effectively. Without access to this content, device manufacturers are essentially unable to market their smart mobile devices.

10.     Google further restricts competition by prohibiting app developers from distributing competing app stores through the Google Play Store. It also requires that developers use the Google

Play Store if they want to take advantage of Google's dominant advertising platforms, including Google Search.

11. Finally, for those lucky few consumers who are able to find an alternate way to download their apps, Google has enacted a series of technological barriers that force those consumers to return to the Google Play Store for their content. If a consumer attempts to download a competing app store or sideload an application, Google sends the user an urgent message warning the consumer of the dangers of their actions. If the consumer persists through that warning, then Google requires the consumer to take a series of complicated steps so that the consumer can download content from locations other than the Google Play Store. And if the consumer is able to make their way through this maze and actually download the app or app store, then Google prevents the product from updating automatically, causing it to run less efficiently than apps downloaded from the Google Play Store.

12. Having obtained control over the distribution of apps on devices with licensable smart mobile OS, Google has now turned its attention to controlling the way in which consumers pay for additional digital content in their apps. Google requires, for apps downloaded through the Google Play Store, that the app use Google Play Billing to process any in-app purchases. Because of Google controls the market for the distribution of apps, developers have no choice but to agree.

13. Consumers have suffered from Google's anticompetitive conduct. Google imposes a 30 percent surcharge on all paid apps and in-app purchases, an amount that they could not charge in a competitive market. Other app stores and payment processors have tried to offer lower prices. They are unable to break through Google's monopoly.

## **PARTIES**

14. Plaintiff Daniel Carroll is a natural person who resides in the State of Illinois. Plaintiff Carroll purchased an app through the Google Play store and also purchased in-app digital content through an app purchased form the Google Play store within the last four years.

15. Daniel Egerter is a natural person who resides in the State of California. Plaintiff Egerter purchased an app through the Google Play store and also purchased in-app digital content through an app purchased form the Google Play store within the last four years.

CLASS ACTION COMPLAINT
Case No.:

16.     Plaintiff Brenda Keegan is a natural person who resides in the State of California. Plaintiff Keegan purchased an app through the Google Play store and also purchased in-app digital content through an app purchased form the Google Play store within the last four years.

17.     Defendant Google LLC is a Delaware limited liability company with its principle place of business in Mountain View, California.  Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principle place of business in Mountain View, California.  Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

18.     Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principle place of business in Dublin, Ireland, and is a subsidiary of Google LLC.  Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

19.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principle place of business in Dublin, Ireland, and is a subsidiary of Google LLC.  Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

20.     Defendant Google Asia Pacific, Pte, Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore and its principle place of business in Mapletree Business City, Singapore, and is a subsidiary of Google LLC.  Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

21.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principle place of business in Mountain View, California, and is a subsidiary of Google LLC. Google payment provides in-app payment processing services to Android app developers and Android

users and collects a 30 percent commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

**JURISDICTION AND VENUE**

22.     This Court has subject-matter jurisdiction over Plaintiffs' federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over the Defendants. Google LLC and Google Payment are headquartered in this District. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements. Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not residing in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue.  In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

25.     Alternatively, this Court has subject-matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount-in-controversy, exclusive of costs and interests, exceeds the sum of $5,000,000, in the aggregate, there are well over 100 members of the proposed Class, and at least one Plaintiff  and one Defendant are citizens of different states.

CLASS ACTION COMPLAINT
Case No.:

**FACTUAL ALLEGATIONS**

I.   **GOOGLE   CONTROLS   THE   LICENSABLE   MOBILE   OPERATING   SYSTEM
     MARKET**

    A.      **The Licensable Mobile Operating System Market**

       26.    Smart mobile devices are handheld, portable, electronic devices that allow the user to connect wirelessly to the Internet and perform multi-purpose computing functions, including internet browsing, shopping, accessing social media, streaming videos and music, and playing games. Smart mobile devices are typically smartphones and tablet computers.

       27.    All smart mobile devices come pre-installed with a mobile OS. The mobile OS "provides a mobile device with its underlying functionality, such as user interface, motion commands, button controls, and facilitates the operation of the device's features, such as the microphone, camera, and GPS."[5] The mobile OS also serves as the interface between the smart mobile device and any applications that run on it. OSs for other systems, such as home computers, or video game consoles (like Microsoft's Xbox) do not work on smart mobile devices and cannot serve as substitutes for them.

       28.    Original equipment manufacturers ("OEMs") design and sell smart mobile devices. OEMs are responsible for installing the OS on the smart mobile device before sale. OEMs must design their products to be compatible with whatever mobile OS they select. OEMs cannot switch easily between different mobile OSs because the process of switching is disruptive, expensive and time-consuming.

       29.    Most OEMs do not own their own mobile OS. They instead license one from a developer. As a result, there is a relevant market for Licensable Smart Mobile OSs. This market consists of smart mobile OSs that OEMs can license for their smart mobile devices. This market does not include: (1) proprietary OSs that are unavailable for licensing, such as Apple's mobile OS (iOS); (2) mobile devices that lack the multi-computing functions of smart mobile devices and tablets (e.g.,

---

[5] *Investigation of Competition in Digital Markets,* Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary, at 100 (Oct. 6, 2020), available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

CLASS ACTION COMPLAINT
Case No.:

"flip phones"); or (3) electronic devices whose OSs are not compatible with other smart mobile device (e.g., desktop computers or gaming systems like the Xbox). Historically, the market for smart mobile OSs has included the Android OS, developed by Google, the Tizen mobile OS, a partially open-source mobile OS that was developed by the Linux Foundation and Samsung, and the Windows Phone OS developed by Microsoft.

30.     The geographic scope of the Licensable Smart Mobile OS Market is worldwide, excluding China. Google's operations in China are limited for legal and regulatory reasons. Google does not make available many of its products for mobile devices sold within China, and non-Google, Android devices are widely available and popular there. While Google contractually requires OEMs licensing Android not to sell devices with competing Android-compatible mobile OSs outside of China, it does not impose such restrictions on devices sold within China. Outside of China, OEMs must all contractually consent that if their device licenses the Android OS, they will not sell devices preloaded with a competing, Android-compatible mobile OS.

31.     The geographic scope of the Licensable Smart Mobile OS Market includes a separate sub-market within the United States which operates as described throughout this Complaint.

**B.      Google's Monopoly Power over the Licensable Smart Mobile OS Market**

32.     Google has monopoly power over the Licensable Smart Mobile OS Market. The Majority Staff for the House of Representatives Subcommittee on Antitrust, Commercial and Administrative Law of the Committee of the Judiciary found that non-Apple and Google OSs comprise less than one percent of the smart mobile OS market.[6] Because Apple does not license its OS to OEMs, that means Google has nearly 100 percent market share of the Licensable Smart Mobile OS Market. The following chart shows market share of mobile OSs over the past several years:

---

[6] *Id.*, p. 101

CLASS ACTION COMPLAINT
Case No.:



33.     A mobile ecosystem of products like apps, devices, and accessories typically develops around a mobile OS. The "Android ecosystem" is a system of mobile products that are inter-dependent and compatible with each other and the Android OS. Ecosystem participants include Google, OEMs of Android-compatible devices, developers of Android-compatible apps, Android app distribution platforms, the makers of ancillary hardware such as headphones or speakers, cellular carriers, and others.

34.     As more developers design useful, compatible apps for a specific mobile OS, the more consumers will want to use that OS. The more consumers using an OS, the more developers want to develop apps for it. Thus, significant barriers to entry arise for new entrants to the OS market. A new OS appeals to consumers only if there is a broad array of software applications running on it, and software developers are not incentivized to create applications for an OS unless there is a large existing user base.

35.     OEMs such as ZTE and Nokia have indicated that other, non-proprietary OSs are inadequate substitutes for and not a reasonable alternative to licensing the Android OS.[7] These other

---

[7] *Google Android*, No. AT.40099, European Commission Decision (July 18, 2018) ("EC Google Android Decision") at ¶ 292, https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf.

CLASS ACTION COMPLAINT
Case No.:

mobile OSs do not currently support many popular mobile apps that consumers demand. OEMs are forced to concede to Google's demands because it is essential that they offer a popular mobile OS and corresponding ecosystem to consumers. Google offers the only licensable one.

36.     In order to attract app developers and users, Google claims that Android is an "open" ecosystem where any participant may create Android-compatible products without unnecessary restrictions. In reality, however, Google uses its Android OS to keep its ecosystem closed to any competition. As the dominant OS licensor, Google recognizes that participation on its platform is a "must-have" market for developers. Google only unlocks the door to its ecosystem for participants willing to play by Google's rules.

37.     As set forth below, Google uses the Android OS to restrict which apps and app stores OEMs pre-install on their devices and to deter the direct distribution of competing app stores and apps to Android users, all at the expense of competition in the Android ecosystem.

## II.     GOOGLE UNLAWFULLY DOMINATES THE LICENSABLE SMART MOBILE OS APP DISTRIBUTION MARKET

### A.     The Licensable Smart Mobile OS App Distribution Market

38.     Mobile apps are standardized pieces of software that can be installed on smart mobile devices. Users access mobile apps for many reasons, including to play games, share digital content, or purchase goods and services.  Mobile apps make smart mobile devices much more valuable because they allow users to customize the functionality of their phone.

39.     Though OEMs pre-install some mobile apps on their devices, they cannot anticipate all their users' needs. Nor can they pre-install apps that have not been developed yet. OEMs must therefore provide a way for users to download apps after they purchase their smart mobile device.

40.     Typically, users download additional apps through an app store that is pre-installed on the smart mobile device. App stores include free apps and paid apps, which require a fee to download. App stores also enable users to search and review apps and remove unwanted apps from their devices. App stores further provide tools and services to developers that design apps for the app store.

CLASS ACTION COMPLAINT
Case No.:

41.     OEMs must include an app store with their devices. Nokia and Microsoft both indicated to the European Commission that it would be commercially unreasonable for an OEM to sell a smart mobile device without an app store.[8]

42.     The app stores available to a user depend on the device's mobile OS. App stores must be compatible with mobile OS and the apps they distribute must also be compatible with the mobile OS.  As a result, Android OS users must use an Android compatible app store to download Android compatible apps. Android OS users cannot, for example, use the Apple App Store because that store is compatible only with Apple's OS and contains apps that are compatible only with Apple's operating system.

43.     There is, as a result, a relevant market for the distribution of apps that work on licensable smart mobile OSs, known as the Licensable Smart Mobile OS App Distribution Market. This market is composed of app stores that make apps that are compatible with licensable smart mobile OSs available for download, including the Google Play Store, Samsung's Galaxy Store, Aptoide, Amazon's Appstore, and F-Droid. Because there is no other licensable smart mobile OS with meaningful market share other than Android, this market is composed essentially of app distribution options for Android devices.

44.     The Licensable Smart Mobile OS App Distribution Market also includes the distribution of apps without the use of an app store. Typically, this is done by downloading the app directly from the developer's website, a process that many refer to as "sideloading."

45.     The European Commission has previously determined there is a "relevant product market" for Android app stores. Google did not contest that determination.[9]

46.     The relevant geographic market for the Licensable Smart Mobile OS App Distribution Market is worldwide, excluding China. China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China. Additionally, app stores prevalent in China are not available, or have little presence, outside of China. Outside of China, app distribution channels like app stores, are globally developed

---

[8] EC Google Android Decision at ¶ 271.
[9] EC Google Android Decision at ¶¶ 217(2), 273.

CLASS ACTION COMPLAINT
Case No.:

1    and distributed, and OEMs, in turn, make app stores like the Google Play Store globally available on

2    Android devices.

3         47.    The geographic scope of the Licensable Smart Mobile OS App Distribution Market

4    includes a separate sub-market within the United States which operates as described throughout this

5    Complaint.

6    **B.    Google's Monopoly Power Over The Licensable Smart Mobile OS App**

7         **Distribution Market**

8         48.    Google has monopoly power over the Licensable Smart Mobile OS App Distribution

9    Market, as evidenced by its substantial market share. The European Commission found that 90 percent

10   of app downloads on devices with the Android OS came from the Google Play Store.[10] No other smart

11   mobile licensable OS has significant market share in the United States.

12        49.    Google's monopoly power is further evidenced by the number of devices which have

13   the Google Play Store pre-installed on them. The European Commission found that the Google Play

14   Store was pre-installed on more than 90 percent of devices that use the Android OS (excluding

15   China).[11] With the exception of app stores designed for and installed only on certain OEMs (e.g., the

16   LG Electronics App Store), no other app store is installed on more than 10 percent of all other Android

17   devices. Aptoide, the largest independent app store outside of China, comes pre-installed on 5 percent

18   of Android devices at most.

19        50.    There are also substantially more apps available for download or purchase on the

20   Google Play Store. Google has more than 2.5 million apps available on the Google Play Store.

21   Combined, the app stores of Samsung, Aptoide, and Amazon have just over 2 million apps available.[12]

22   This disparity does not result from price competition; the commission that Aptoide charges on an app

23   sold through its store is half that of Google.[13]

24

25   _____

26   [10] Press Release, Antitrust: Commission fines Google €4.34 billion for illegal practices regarding
     Android mobile devices to strengthen dominance of Google's search engine, European Commission
27   (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.
     [11] EC Google Android Decision at ¶ 596
28   [12] *Id.*, ¶ 608.
     [13] *Id.*, ¶ 602.

-12-

CLASS ACTION COMPLAINT
Case No.:

51.     As noted before, the number of apps available on an app store is critical to that store developing market share. The more apps available, the more consumers will use that app store. The more consumers that use the app store, the more developers will want to make apps specifically for that store. In 2014, there were nearly eight times as many developers using the Google Play Store for distribution as the Amazon Appstore.[14]

52.     OEM "attach significant importance" to the number of apps available on an app store and the number of developers that use that store.[15] As a result, Android OEMs find it commercially unreasonable to make and sell phones without the Google Play Store, and they view other app stores as poor substitutes because they offer fewer and less impressive apps and do not have as many developers working on apps that can be developed through those stores.

53.     Google's monopoly power in the Licensable Smart Mobile OS App Distribution Market is further evidenced by the fact that it imposes a 30 percent commission on apps purchased through the Google Play Store. This commission is far higher than would occur in competitive conditions. As noted before, the commission imposed by Aptoide is half of Google's.

54.     Apple does not constrain Google's monopoly power in the Licensable Smart Mobile OS App Distribution Market. Because there are substantial costs to switching to a smart device with a different OS, consumers rarely switch between mobile OSs when they purchase a new device. A 2018 Consumer Intelligence Research Partners report found that 90 percent of Android device users who bought a new device purchased a new Android device.[16] The Majority Staff for the House of Representatives Subcommittee on Antitrust, Commercial and Administrative Law of the Committee of the Judiciary also reported that mobile carriers and app developers rarely observed customer switching between mobile OSs.[17]

---

[14] *App Stores Growth Accelerates in 2014*, Ariel (13 January 2015), available at http://blog.appfigures.com/app-stores-growth-accelerates-in-2014.
[15] EC Google Android Decision at ¶ 613.
[16] Press Release, Consumer Intel. Research Partners, LLC, Mobile Operating System Loyalty: High and Steady, (Mar. 8, 2018), http://files.constantcontact.com/150f9af2201/4bca9a19-a8b0-46bd-95bd-85740ff3fb5d.pdf.
[17] *Investigation of Competition in Digital Markets*, *supra* n. 5 at 103.

CLASS ACTION COMPLAINT
Case No.:

55.     There are many reasons why consumers are reluctant to switch between mobile OSs. First, the different mobile OSs have different settings, configurations, and designs. Consumers must learn these specifications in order to operate the new device effectively. It is far easier for consumers to learn one system and stick with it than switch to a new device.[18]

56.     Second, consumers invest significant money in purchasing apps, or making in-app purchases once they have downloaded those apps. Consumers who want to switch mobile OSs cannot transfer most of their purchases over to a new device; they must instead repurchase those apps again on the new device. In 2016, the average Android user spent $30 on apps.[19] This amount has undoubtedly increased over time, as Google Play revenue increased by more than 20 percent in the past year alone.[20]

57.     The average American keeps their smartphone for approximately two years before upgrading.[21] At a minimum, that means the average American has to spend approximately $60 to reinstall all of their apps if they switch to a different operating system – more if the person's previous devices also used the same operating system. Thus, any consumers who switch from a Google Android device to an Apple device would lose the substantial financial investment they made in previously-purchased apps. This further increases the cost of switching mobile OSs.

58.     Third, many consumers store photos and other personal information on their phone. The average Android user has more than 900 photos saved on their phone, along with contacts, messages, and calendar entries.[22] To switch operating systems, the user would need to arrange for the transfer of all that information to their new smart mobile device. The time and effort required to do is substantial.

---

[18] *Id.*

[19] *U.S. Android Users Spent an Average of $30 on Google Play Apps in 2016*, SensorTower (June 1, 2017), https://sensortower.com/blog/revenue-per-android-device-2016.

[20] Global App Revenue Reached $50 Billion in the First Half of 2020, Up 23% Year-Over-Year, SensorTower (June 30, 2020), https://sensortower.com/blog/app-revenue-and-downloads-1h-2020.

[21] *Smartphone users are waiting longer before upgrading – here's why*, CNBC (May 17, 2019), https://www.cnbc.com/2019/05/17/smartphone-users-are-waiting-longer-before-upgrading-heres-why.html.

[22] *Survey shows 22 percent of all Android photos are duplicates or law quality*, ZDNet (Oct. 7, 2019), https://www.zdnet.com/article/survey-shows-22-of-all-android-photos-are-duplicates-or-low-quality/.

59.     Finally, when purchasing a mobile device, consumers are unlikely to inquire about Google's anticompetitive contractual restraints and policies. Mobile device purchasers focus on design, brand, processing power, battery life, and cellular plan. These features play a decisive role in a consumer's decision as to which smart mobile device to purchase.

60.     Consumers are also unable to determine the "lifecycle price" of devices, that is how much they will ultimately spend (including on the device and all apps and in-app purchases) for the duration of their device ownership. Consumers do not and cannot predict all of the apps or in-app content they may eventually purchase. Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to accurately predict the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

61.     Consumers who purchase Android devices are therefore "locked-in" to the Android OS and Android app stores.

**C.     Google's Anticompetitive Conduct In The Licensable Smart Mobile OS App Distribution Market**

62.     To maintain its monopoly power over the Licensable Smart Mobile OS App Distribution Market, Google has engaged in a series of anticompetitive actions that target OEMs, developers, and consumers.

63.     Through its conduct, Google has been able to foreclose any other app store from offering meaningful competition to its Google Play Store, thus allowing Google to continue imposing its 30 percent commission on purchases made through that store. Google is able to get away with these actions in part because of its monopoly power over the Licensable Smart Mobile OS Market.

**1. Google requires OEMs to give Google Play Preferential Treatment**

64.     Google's first target in its monopolistic scheme is OEMs. Google requires OEMS to enter into a Mobile Application Distribution Agreement ("MADA") in order to obtain use of the

-15-

CLASS ACTION COMPLAINT
Case No.:

Android trademark and certain proprietary Google Apps.[23]  As a condition of the MADA, the OEM must agree to pre-install the Google Play Store and locate it on the home screen of the mobile device.[24] The OEM must also install several other Google apps on either the home screen or the next screen over.[25] These apps take up critical memory; one OEM complained that it sold a 16 GB phone that had only 7 or 8 GBs free.[26]

65.     Pre-installation is also "critical for successful distribution."[27] Apps that are pre-installed are among the most used by consumers. In addition, apps that are placed in premium positions, like the home screen, are also used more frequently and less likely to be deleted.[28]  Google recognizes this, which is why it demands preferential treatment for its products.[29]

66.     HP described the practice of premium placement and default settings as "the creation of a 'status quo bias.'"[30] HP elaborated:

> Premium placement and default settings give applications and services located in those positions the advantage of being the first things users see when they start to interact with their device. Users are more likely to try these applications/services based on their prominent visibility and once they are using them, they usually continue to do so. It is an easy way to obtain new users and deliver almost automatic stickiness for an application or service.[31]

---

[23] Federico Etro & Cristina Caffarra, *On the economics of the Android case,* European Competition Journal Vol. 13, Nos. 2-3, 282-313 at 286–87 (Sept. 28, 2017), https://www.tandfonline.com/doi/pdf/10.1080/17441056.2017.1386957?needAccess=true (last visited Oct. 14, 2020).

[24] *Id.*

[25] *Id.*

[26] *Investigation of Competition in Digital Markets*, *supra* n. 5 at 215.

[27] *Id.*

[28] EC Google Android Decision at ¶¶ 780–81.

[29] *Id.*

[30] *Id.*, ¶ 781

[31] *Id.*

CLASS ACTION COMPLAINT
Case No.:

67. OEM Nokia agrees, saying "Where a product is preloaded by default, consumers tend to stick to this product at the expense of competing products – even if the default product is inferior to competing products."[32] Yahoo also noted that only "a small percentage of users download applications that compete with the pre-installed choices."[33] Other developers and OEMs, including Amazon, confirmed the same to the European Commission.[34]

68. Google acknowledges this. In a November 2010 e-mail, a Google executive stated that "Preloading remains valuable to users . . . because most users just use what comes on the device. People rarely change defaults."[35]

69. OEMs have no choice but to comply with Google's demands for pre-installation and premium placement. Without the Android trademark, the OEM will find it impossible to market its device because it will not be able to use the only marketable OS available in the United States.

70. Further, the proprietary apps that are bundled with the Google Play Store include Google Search, YouTube, and Gmail. The following chart details how widely used these particular apps are:[36]

---

[32] *Id.*, ¶ 782

[33] *Id.*, ¶ 807(1).

[34] *Id.*, ¶ 789.

[35] *Id.*, ¶ 787(2).

[36] *Id.*, ¶ 137.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**Figure 5: Top 25 apps in the US by unique visitors[115]**



16 As the chart shows, YouTube is the most used video-sharing app and Gmail is the most used e-mail

17 app.[37] OEMs must have these apps to market their products to consumers.

18        71.    Because of Google's demands, OEMs cannot locate competing app stores in a

19 prominent location. They must cede the spotlight to the Google Play Store, along with the substantial

20 benefits of pre-installation and premium placement. Consumers default to the Google Play Store as a

21 result.

22        72.    Google also bundles the Google Play Store with Google Play Services. Google Play

23 Services is a background service that runs on Android and helps integrate "Google's advanced

24 functionalities with other applications."[38] Google Play Services allows, among other things, apps to

25 access Google Maps, perform certain actions when a user enters or leaves a geographic area, share

26

27 [37] *Id.*; *see also* Mobile *App Ranking*, Similar Web, https://www.similarweb.com/apps/top/google/app-index/us/all/top-free/ (last accessed Oct. 15, 2020).

28 [38] *What is Google Play Services? Why Do You Need It?*, FossBytes (Nov. 30, 2019), https://fossbytes.com/google-play-services-necessity/

CLASS ACTION COMPLAINT
Case No.:

and store files on Google Drive, use Google's cloud messaging service, and "cast" content onto other screens.

73.     Google Play Services is critical to OEMs. Without it, the Android OS is more like a feature phone OS than a smartphone OS.[39] Almost all of Google's own apps rely on Google Play Services. Sixty percent of the most downloaded apps in the Google Play Store use Google's cloud messaging service, while 45 percent of all Android apps use Google's mobile advertising service.[40] Without these services, many apps would not function on the Android OS as effectively.[41] Google will not, however, license Google Play Services separately from the Google Play Store, further forcing OEMs to acquiesce to Google's demands regarding its app store.

### 2. App Developer Contracts

74.     Google also places restrictions on app developers to maintain its monopoly over in the Licensable Smart Mobile OS App Distribution Market.

75.     Google enforces these restrictions through Google Play's Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps via the Google Play Store. All Defendants, other than Google Payment, are a party to the DDA. The DDA is non-negotiable, so developers seeking access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

76.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."[42] The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement.[43]

---

[39] EC Google Android Decision at ¶ 623.
[40] *Id.*, ¶ 142.
[41] *Id.*
[42] *See Google Play Developer Distribution Agreement,* Google,
https://play.google.com/about/developer-distribution-agreement/archive.html. (last accessed Oct. 14, 2020).
[43] *Id.*

-19-

77.     Put another way, this means that Google prohibits app developers from creating apps that, if downloaded from the Google Play Store, would serve as a competing app store. Absent this provision, app developers could easily distribute competing app stores through the Google Play Store, allowing consumers the choice necessary to lower prices and foster greater innovation. App stores could emerge that, for example, cater to specific interests of a subset of consumers. Without Google's unlawful restraints, these app stores would provide additional platforms on which more apps could be featured, and thereby, discovered by consumers.

78.     Google also maintains monopoly control over the Licensable Smart Mobile OS App Distribution Market by arbitrarily enforcing its own Google Play Store policies. One app developer described these policies as "an opaque system [that] threatens the ability of app developers to develop and compete in the market for consumers, who should ultimately determine what apps they use."[44] Google is able to use the threat of enforcement to ensure adherence to Play Store policies and further incentivize developers not to create or work with competing app stores.

79.     Google also targets app developers through its dominance in the search industry. Google offers developers an App Campaigns program that allows them to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest properties."[45] This program includes ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners," that are specially optimized for the advertising of mobile apps.[46]

80.     These advertising options are critical to app developers if they want to promote their apps to consumers. According to Google, one-in-four users discovers an app through a search engine.[47] For certain categories of apps, including travel and local apps, this rate is even higher.[48] Google notes,

---

[44] *Investigation of Competition in Digital Markets*, *supra* n. 5 at 221

[45] Google Ads Help, *About App campaigns,* GOOGLE, https://support.google.com/googleads/answer/6247380?hl=en. (last accessed Oct. 14, 2020).

[46] *Id.*

[47] *Mobile app marketing insights: How consumers really find and use your apps*, Think with Google (May 2015), available at https://www.thinkwithgoogle.com/marketing-strategies/app-and-mobile/mobile-app-marketing-insights/.

[48] *Id.*

CLASS ACTION COMPLAINT
Case No.:

for example, that when the app HotelsCombined introduced Google Search and AdMob to its mobile app marketing strategy, downloads increased 150 percent.[49]

81.     Google dominates these search engine platforms. Google has approximately 88 percent market share in the general search services market. In addition, because of Google's entrenched dominance in the search field, its search engine is far more refined than any competing engine and is thus much more effective in allowing users to obtain the results they are looking for.[50]

82.     But to access the App Campaigns program and thus the benefit of Google Search, Google requires that app developers list their app in either the Google Play Store to reach Android users, or in the Apple App Store to reach Apple iOS users. This conduct further solidifies Google's monopoly in Licensable Smart Mobile OS App Distribution Market because again, the more apps available in an app store, the more likely a consumer is to use that app store, and the more likely a developer is to create apps for that store. By conditioning access to critical advertising opportunities on the use of the Google Play Store, Google is further able to entrench its dominance over the Licensable Smart Mobile OS App Distribution Market.

### 3. Technological Restrictions

83.     In addition to restricting OEMs and app developers from taking steps to favor other app stores, Google also makes it difficult for consumers to download apps from sources other than the Google Play Store. In some cases, Google forcibly removes or prevents users from installing apps that it claims are "harmful."[51]

---

[49] *Id.*

[50] Google also gives preferential treatment to those that use its services. One third party reported that, once it stopped using AdMob, Google's in-app ads monetization tool, Google began to notify the third-party of policy violations related to content that had been included in the third-party's app for years. *Investigation of Competition in Digital Markets*, *supra* n. 5 at 222. This disparate treatment further incentives third-parties to use Google's advertising services and further entrenches them in the Google Play Store.

[51] Google Play Help, Help Center, *Help protect against harmful apps with Google Play Protect*, Google, https://support.google.com/googleplay/answer/2812853?hl=en (last accessed Oct. 14, 2020); *See also Unwanted Software Policy*, GOOGLE, https://www.google.com/about/unwanted-software-policy.html (last accessed Oct. 8, 2020).

-21-

84.     In the rare case that a consumer is able to access an app from a competing app store, Google imposes unjustified and pretextual warnings about the security of installing the app in order to discourage its download from alternative sources other than the Google Play Store. This conduct dissuades users from downloading apps outside of the Google Play Store.

85.     For example, beginning in 2018, Google began to flag the competing app store Aptoide as a harmful app.[52] When users tried to access Aptoide, Google sent them the following alert, resulting in as much as a 20 percent decrease of unique Aptoide users:



86.     Google's claim that the download of apps from locations other than the Google Play Store will impair a user's security is wholly without merit. Aptoide indicates that Google-owned Virus Total has deemed Aptoide safe.[53]

87.     In addition while Google claims to permit consumers to directly download and install Android-compatible apps and app stores ("sideloading"), in reality, Google uses its monopoly power in the Smart Mobile Licensable OS Market to make that process extremely difficult. As Amazon explained to the European Commission:

> "[E]ven for consumers who discover and download an alternate store
> outside of the Play Store, Google has configured Android to block the
> installation of that store. Consumers are unable to install downloadable
> app stores unless the consumer first navigates to and changes Android's

---

[52] *Aptoide, A Play Store rival, cries antitrust foul over Google hiding its app*, TechCrunch (June 4, 2019), https://techcrunch.com/2019/06/04/aptoide-a-play-store-rival-cries-antitrust-foul-over-google-hiding-its-app/
[53] *Id.*

CLASS ACTION COMPLAINT
Case No.:

obscure 'Unknown Sources' setting to allow installation of apps from sources other than the Play Store. When consumers attempt to change this setting, Google displays a message warning that 'your [tablet or phone] and personal data are more vulnerable to attack by apps from unknown sources. You agree that you are solely responsible for any damage to your tablet or loss of data that may result from using these apps.'"[54]

88.     The Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary further explained:

"Google has created significant friction for sideloading apps to Android devices. One developer explained to Subcommittee staff that sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading. Additionally, software developers that have left the Play Store to distribute software to Android users via sideloading have experienced precipitous declines in downloads and revenue and report problems updating their apps. Thus, the option for sideloading apps on mobile devices does not discipline the market power of dominant app stores."[55]

89.     Users who own Android devices that are part of Google's Advanced Protection Program ("APP") are outright prohibited from downloading apps directly from the developer ("sideloading").[56] They can only download apps distributed in the Google Play Store or in another pre-installed app store that Google pre-approved an OEM to offer on its devices.[57] Thus, app developers cannot reach APP users unless they agree to distribute their apps through the Google Play Store or

---

[54] EC Google Android Decision at ¶ 635 citing to n.677 in Decision: "See Amazon's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 4067)."

[55] *Investigation of Competition in Digital Markets*, *supra* n. 5 at 97–98.

[56] Google Advanced Protection Program, GOOGLE, https://landing.google.com/advancedprotection/. (last accessed Oct. 14, 2020).

[57] *Id.*

CLASS ACTION COMPLAINT
Case No.:

through a separate Google-approved, OEM-offered app store. Some OEMs also indicate that they have entered into contracts with Google that prohibit sideloading.[58]

90.     Even if a user proceeds past Google's unjustified threats and warnings and directly downloads an app, the end product is inferior to an app downloaded through the Google Play Store. This is because Google only allows apps downloaded via the Google Play Store to update in the background. For sideloaded apps, users must manually approve every update.

91.     But for Google's anticompetitive acts, Android users could download apps from developers' websites, rather than through an app store. Millions of personal computer users safely download and install software directly from developers every day, such as through Google's own Chrome browser or Mozilla Firefox. They rely on security screening by a neutral software company to protect their devices. Such screening could easily be used to protect smart mobile devices and allow them to safely download apps and competing app stores. There is no justification for Google treating this Licensable Smart Mobile OS App Distribution Market any different, other than its desire to maintain its supracompetitive commission.

92.     Because of Google's conduct, direct downloading is not a viable way for apps and competing app stores to reach Android users. The Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary recently concluded that other app stores and the sideloading of apps "do not provide meaningful alternatives to the Google Play Store," and "[t]he dual dominance of the Play Store and the Android ecosystem enable Google to exert control and engage in conduct that harms competition by exploiting, excluding, and discriminating against rivals."[59]

93.     Through these anticompetitive acts Google has willfully obtained a virtual monopoly over Android mobile app distribution and thus over the Licensable Smart Mobile OS App Distribution Market. Google Play Store downloads now account for more than 90 percent of downloads through Android app stores, dwarfing other available distribution channels.

**D.     Effects of Google's Anticompetitive Conduct**

---

[58] *Investigation of Competition in Digital Markets*, *supra* n. 5 at 220–21.
[59] *Id*. at 220.

-24-

CLASS ACTION COMPLAINT
Case No.:

94.     Google's anticompetitive conduct forecloses competition in the Licensable Smart Mobile OS App Distribution Market, affecting interstate commerce with respect to this market, causing anticompetitive harm and antitrust injury to consumers.

95.     Google's anticompetitive conduct forces OEMs to commit valuable home screen space to the Google Play Store (and other required Google applications), with no regard for the OEM's preferences, including having other app stores or developers' icons on the home page. These requirements limit OEMs' ability to compete with each other on price and quality of distribution platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other in being able to offer consumers Android devices with customized pre-installed apps curated to specific categories of mobile device consumers.

96.     Google's anticompetitive conduct harms consumers by impeding competition among app distributors, who would otherwise innovate new models of app distribution, such as genre specific app stores and provide consumers choices that extend beyond Google's app store.

97.     Consumers are harmed, damaged and injured by Google's imposition of a supracompetitive 30 percent commission on the purchase price of apps and in-app purchases sold through the Google Play Store. This is a much higher transaction fee than would exist in a competitive market unimpaired by Google's anticompetitive conduct. Google's supracompetitive prices reduce the output of mobile apps and related content by reducing app developers' incentives and capital to develop new apps and content.

98.     Google's monopoly over of the Licensable Smart Mobile OS App Distribution Market hinders the ability and incentive for app developers to launch competing app stores, limiting consumers' ability to discover new apps of interest to them. If there were more competing app stores, this would permit additional platforms to feature more and more diverse collections of apps. Instead, consumers are left to search for millions of apps in one monopolized app store, where Google controls which apps are featured, identified or prioritized in user searches.

CLASS ACTION COMPLAINT
Case No.:

**III. GOOGLE DOMINATES THE LICENSABLE SMART MOBILE OS IN-APP PAYMENT PROCESSING MARKET**

**A.**     **The Licensable Smart Mobile OS In-App Payment Processing Market**

99.     Google uses its monopoly power over the Licensable Smart Mobile OS App Distribution Market to unlawfully maintain monopoly power in another market: the Licensable Smart Mobile OS In-App Payment Processing Market.

100.     Many apps allow the user to purchase additional digital content while using the app. For apps that are free to download, this gives the consumer the advantage of trying the product for free and investing money in it only if they decide they want more access.

101.     According to Google, consumers may purchase two types of digital content in their app.[60] The first type is "one-time" products that require a single, non-recurring charge. One-time products are either consumable, meaning they can be used up and purchased again, or non-consumable, meaning they provide a permanent benefit to the app. For example, the popular app "Candy Crush" gives the user a set amount of "lives" when you first start playing the game. If the user runs out of those lives, the user cannot play the game anymore unless they wait a certain amount of time or purchase additional lives. The purchase of additional lives is considered a form of consumable digital content by developers. An example of a non-consumable in-app purchase would be a permanent upgrade to a premium version of an app. For example, a person who downloaded the Words with Friends app could upgrade it to a premium version that did not include advertisements.

102.     The second type of digital content that consumers purchase is subscriptions, which provide access to recurring content. Consumers pay for these apps usually on a monthly or annual basis.

103.     In-app purchases are critical to app developers. The total revenue generated from in-app purchases is 20 times more than the revenue generated by pay-to-download apps.[61]

---

[60] *Google Play's billing system overview*, Google, https://developer.android.com/google/play/billing (last visited Oct. 15, 2020).
[61] *What Does In-App Purchase Mean in Mobile Marketing*, CleverTap (Apr. 4, 2019), https://clevertap.com/blog/what-does-in-app-purchase-

CLASS ACTION COMPLAINT
Case No.:

104.    App developers who sell digital content through their apps rely on electronic payment processing software to process those purchases. As a result, there is a relevant market comprised of payment processing solutions that app developers could integrate into apps compatible licensable smart mobile OSs to process the purchase of in-app digital content. This market is known as the Licensable Smart Mobile OS In-App Payment Processing Market.

105.    Within the Licensable Smart Mobile OS In-App Payment Processing Market is a relevant submarket, known as the Licensable Smart Mobile OS Games Payment Processing Market. Mobile game developers frequently make digital content available to users for purchase. For that content to be effective, the user must be able to purchase the content without disrupting the app itself. App developers who sell digital content rely on in-app payment processing tools to process consumers' purchases in a seamless and efficient manner.

106.    The geographic scope of the Licensable Smart Mobile OS In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools available in China are not available outside of China, including because Google prevents the use of non-Google payment processing tools for all apps distributed through the Google Play Store, which dominates distribution of apps outside of China.

107.    The geographic scope of the Licensable Smart Mobile OS In-App Payment Processing Market includes a separate sub-market within the United States which operates as described throughout this Complaint.

**B.    Google's Monopoly Power in the Licensable Smart Mobile OS In-App Payment Processing Market**

108.    For applications downloaded through the Google Play Store, Google requires the developer to use the Google Play Billing software to process in-app digital content purchases.[62]

---

mean/#:~:text=Netflix%2C%20Hulu%2C%20and%20Pandora%20are,can%20be%20used%20across%20devices.

[62] Play Console Help, Policy Center, Monetization and Ads, *Payments*, Google, https://support.google.com/googleplay/android-developer/answer/9858738, (last accessed Oct. 14, 2020).

CLASS ACTION COMPLAINT
Case No.:

Because 90 percent or more of licensable smart mobile OS compatible mobile app downloads through an app store occur in the Google Play Store, Google has monopoly power in the Licensable Smart Mobile OS In-App Payment Processing Market.

109.   Google's monopoly power is further evidenced by the fact that it imposes a 30 percent commission on all purchases made through Google Play Billing. This rate is much higher than that charged by electronic payment processing providers. For example, the electronic processing payment rate for online payment processing company PayPal is less than three percent.[63]

### C.   Google's Anticompetitive Conduct in the Licensable Smart Mobile OS In-App Payment Processing Market

110.   As stated above, Google conditions access to its Google Play Store on the app developer's agreement to use Google Play Billing software to process in-app purchases of digital content and for all purchases within Android games.

111.   Google's unlawful tying agreement is reflected in the terms and conditions of its DDA, which it imposes on all app developers seeking access to Android users. Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Google Payment, to receive payment for and from apps and in-app digital content.

112.   In addition, Section 4.1 of the DDA makes compliance with Google's Developer Program Policies mandatory. Those Policies require that (1) app developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-App Billing as the method of payment and (2) app developers offering products within another category of app downloaded on Google Play must use Google Play In-App Billing as the method of payment, except when the payment is solely for physical products or is for digital content that may be consumed outside of the app itself (e.g., songs that can be played on other music players).

---

[63] *Credit card processing fees: What business owners need to know,* PayPal, (May 15, 2020), https://www.paypal.com/us/brc/article/understanding-merchant-credit-cardprocessing-fees.

CLASS ACTION COMPLAINT
Case No.:

**D. The Effects of Google's Anticompetitive Conduct in the Licensable Smart Mobile OS In-App Payment Processing Market**

113.    Without Google's anticompetitive conduct, Android app developers could integrate other compatible payment processors into their apps to facilitate the purchase of in-app digital content. App developers would be able to offer consumers a choice among multiple payment processors for each purchase, similar to how brick-and-mortar stores allows consumers the options of using different credit cards or Apple pay.

114.    More choice would result in lower prices. As alleged above, Google currently charges a supracompetitive 30 percent commission for Google Play Billing, an amount that is ten times higher than some of its competitors. Consumers would benefit from lowers rate if there was fair competition in this market.

115.    In addition, by requiring that in-app purchases be transacted through Google Play Billing, Google prevents app developers from providing customer service to consumers directly. Google has minimal incentive to compete through improved customer service because it faces no competition.

116.    Furthermore, by obtaining information concerning app developers' transactions with their customers, Google has an anticompetitive edge in its advertising, whether or not app developers and consumers want to share their information with Google. In these ways as well as others, Google directly harms app developers' relationships with consumer who use their apps and make in-app purchases.

117.    Google has no legitimate justification for its conduct. Google cannot reasonably claim to be concerned about the security of its users' payment information. Were that truly the case, it would not permit the use of alternative payment processing methods  to purchase physical products or digital content consumed outside an app.[64]

118.    Google's conduct harms competition in the Licensable Smart Mobile OS In-App Payment Processing Market (including the Licensable Smart Mobile OS Games Payment Processing

---

[64] *See Google Play Developer Distribution Agreement*, supra n. 42.

CLASS ACTION COMPLAINT
Case No.:

Market) and injures consumers, app developers, and competing in-app payment processors. Google's conduct further harms would-be competitor in-app payment processors who would otherwise be free to offer consumers alternative payment processing tools with lower prices and improved functionality. Google's supracompetitive prices reduce app developers' incentives to invest in and create additional apps and in-app content for consumers.

## ANTITRUST INJURY

119.    Plaintiffs and Class members have suffered antitrust injury as a direct result of Google's unlawful conduct.

120.    By unlawfully restricting competition in the Licensable Smart Mobile OS App Distribution Market, Google's unlawful conduct has enabled it to charge supra-competitive prices to consumers.

121.    By unlawfully impairing competition in the Licensable Smart Mobile OS In-App Payment Processing Market, Google's unlawful conduct has enabled it to charge supra-competitive prices to consumers.

122.    Plaintiffs and Class members are the direct purchasers of apps compatible with licensable smart mobile OSs and in-app purchases. When Plaintiffs and Class members purchase their apps, they do so directly on Google Play and pay Google directly, using their credit card or other payment sources. When Plaintiffs and Class members purchase in-app digital content, they do through Google Play, using the payment source set up when purchasing that app or other apps on Google Play. When Plaintiffs and Class members purchase in-app digital content, they pay Google directly.

## CLASS ALLEGATIONS

123.    Plaintiffs bring this action for themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

124.    All persons in the United States who paid for an app on the Google Play Store, subscribed to an app obtained on the Google Play Store, or paid for in-app digital content on an app obtained on the Google Play Store within the relevant statute of limitations (the "Class Period").

125.    Specifically excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any

CLASS ACTION COMPLAINT
Case No.:

affiliate, legal representative, heir, or assign of any Defendant and any person action on their behalf. Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

126.    The Class is readily ascertainable and the records for the Class should exist, including, specifically, within Defendants' own records and transaction data.

127.    Due to the nature of the trade and commerce involved, there are least one million geographically-dispersed members in the Class, the exact number and their identities being known to Defendants, such that individual joinder in this case is impracticable.

128.    Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein. The damages and injuries of each member of the Class were directly caused by Defendants' wrongful conduct.

129.    Plaintiffs and their counsel will fairly and adequately protect and represent the interests of the Class. Counsel for Plaintiffs are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert the claims of Class members. Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. Plaintiffs has no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

130.    Numerous questions of law and fact are common to the claims of Plaintiffs and members of the proposed Class, and those questions predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

a.    Whether there is a relevant Licensable Smart Mobile OS App Distribution Market;

b.    Whether there is a relevant worldwide geographic market, excluding China;

c.    Whether Google unlawfully obtained and/or maintained monopoly power in the Licensable Smart Mobile OS App Distribution Market;

d.    Whether competition in the Licensable Smart Mobile OS App Distribution Market has been restrained and harmed by Google's monopolization and anticompetitive restrictions;

e.   Whether there is a relevant Licensable Smart Mobile OS In-App Payment Processing Market;

f.   Whether Google unlawfully obtained and/or maintained monopoly power in the Licensable Smart Mobile OS In-App Payment Processing Market;

g.   Whether competition in the Licensable Smart Mobile OS In-App Payment Processing Market has been restrained and harmed by Google's monopolization and anticompetitive restrictions;

h.   Whether Google's contractual restrictions for Google Play further Google's attempt to monopolize the Licensable Smart Mobile OS App Distribution Market;

i.   Whether Google's restrictions on sideloading apps is an attempt to, and does further maintain Google's monopoly over the Licensable Smart Mobile OS App Distribution Market;

j.   Whether Google's conduct results in supra-competitive prices for apps compatible with licensable smart mobile OSs, in-app purchases, and/or subscriptions to apps obtained in the Google Play Store;

k.   Whether Plaintiffs and Class members have been harmed by Google's unlawful practices;

l.   Whether Plaintiffs and Class members are entitled to injunctive relief; and

m.  The appropriate Class-wide measures of damages.

131.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class members to seek redress for the violations of law alleged herein.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CAUSES OF ACTION**

## **COUNT 1**

### **Sherman Act § 2 Unlawful Monopoly Maintenance in the Licensable Smart Mobile OS App Distribution Market (Against all Defendants except Google Payment)**

132.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

133.    Google's conduct violates §2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

134.    The Licensable Smart Mobile OS App Distribution Market is a valid antitrust market.

135.    Google holds monopoly power in the Licensable Smart Mobile OS App Distribution Market, as evidenced by its high market and its ability to charge a supracompetitive 30 percent commission on the purchase of all apps through the Google Play Store.

136.    Google has unlawfully maintained monopoly power in the Licensable Smart Mobile OS App Distribution Market through the anticompetitive acts described herein, including, but not limited to: (1) conditioning licensing of the Google Play Store, other essential Google services and the Android trademark, on OEMs' agreement to pre-install the Google Play Store and give it premium placement; (2) prohibiting developers from distributing competing app stores through the Google Play Store; (3) conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store; and (4) imposing technical restrictions and obstacles on OEMs, developers, and consumers that prevent consumers from accessing Android apps through means other than the Google Play Store.

137.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

138.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

139.     Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for apps and/or in-app purchases than they would have paid in a competitive market. Plaintiffs was also injured because Google's unlawful monopolization of the Licensable Smart Mobile OS App Distribution Market extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Additionally, Plaintiffs was injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of apps compatible with licensable smart mobile OSs, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 2

### Sherman Act § 1 Unreasonable Restraints of Trade Concerning The Licensable Smart Mobile OS App Distribution Market: OEMs
### (Against all Defendants except Google Payment)

140.     Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

141.     Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

142.     Google has entered into agreements with OEMs that unreasonably restrict competition in the Licensable Smart Mobile OS App Distribution Market. These include that MADA, which conditions OEMs' access to the Google Play Store, other essential Google services, and the Android trademark on the OEM's agreement to pre-install the Google Play Store and give premium placement to that store.

143.     These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Licensable Smart Mobile OS App Distribution Market.

-34-

144.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

145.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

146.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for apps and/or in-app purchases than they would have paid in a competitive market. Plaintiffs was also injured because Google's unlawful monopolization of the Licensable Smart Mobile OS App Distribution Market extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Additionally, Plaintiffs was injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of apps compatible with licensable smart mobile OSs, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 3

**Sherman Act § 1 Unreasonable Restraints of Trade Concerning The
Licensable Smart Mobile OS App Distribution Market: DDA
(Against all Defendants except Google Payment)**

147.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

148.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

149.    Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of their apps being distributed through

CLASS ACTION COMPLAINT
Case No.:

the Google Play Store. These agreements unreasonably restrain competition in the Licensable Smart Mobile OS App Distribution Market.

150. Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Device and Network Abuse" Policy, Google prohibits developers from distributing apps that download executable code from a source other than Google Play. The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the app on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

151. These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Licensable Smart Mobile OS App Distribution Market.

152. Google's conduct affects a substantial volume of interstate as well as foreign commerce.

153. Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

154. Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They paid more for apps compatible with licensable smart mobile OSs or in-app purchases than they would have paid in a competitive market. Plaintiffs was also injured because Google's unlawful monopolization of the Licensable Smart Mobile OS App Distribution Market extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Additionally, Plaintiffs was injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of apps compatible with licensable smart

-36-

mobile OSs, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 4

**Sherman Act § 2 Unlawful Monopolization and Monopoly
Maintenance in the Licensable Smart Mobile OS In-App Payment
Processing Market
(Against all Defendants)**

155.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

156.    Google's conduct violates §2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

157.    The Licensable Smart Mobile OS In-App Payment Processing Market is a valid antitrust market. In the alternative, the Licensable Smart Mobile OS Games Payment Processing Market is a valid antitrust market.

158.    Google holds monopoly power in the Licensable Smart Mobile OS In-App Payment Processing Market and, in the alternative, in the Licensable Smart Mobile OS Games Payment Processing Market.

159.    Google has unlawfully acquired monopoly power in these Markets, including through the anticompetitive acts described herein. However Google initially acquired its monopoly, it has unlawfully maintained its monopoly through the anticompetitive acts described herein.

160.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

161.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

162.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, they paid more for Android in-app purchases

than they would have paid in a competitive market. Plaintiffs was also injured because Google's unlawful monopolization of the Licensable Smart Mobile OS In-App Payment Processing Market has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiffs was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of in-app purchases, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 5

**Sherman Act § 1 Unreasonable Restraints of Trade Concerning**
**Licensable Smart Mobile OS In-App Payment Processing Market**
**(Against all Defendants)**

163.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

164.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

165.    Google, except Google Payment, forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, Google Play Store. The relevant provisions of these agreements unreasonably restrain competition in the Licensable Smart Mobile OS In-App Payment Processing Market.

166.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases of digital content. Further, compliance with Google's Developer Program Policies,

CLASS ACTION COMPLAINT
Case No.:

which § 4.1 of the DDA makes obligatory, requires that apps distributed through the Google Play Store "use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of solely "physical products" or of "digital content that may be consumed outside of the app itself," Google expressly applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

167.    The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the Licensable Smart Mobile OS In-App Payment Processing Market and, in the alternative, the Licensable Smart Mobile OS Games Payment Processing Market.

168.    Defendants' conduct affects a substantial volume of interstate as well as foreign commerce.

169.    Defendants' conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

170.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, they paid more for Android in-app purchases than they would have paid in a competitive market. Plaintiffs was also injured because Google's unlawful monopolization of the Licensable Smart Mobile OS In-App Payment Processing Market has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiffs was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of in-app purchases, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

CLASS ACTION COMPLAINT
Case No.:

**COUNT 6**

**Sherman Act § 1 Tying Google Play Store to Google Play Billing**
**(Against all Defendants)**

171.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

172.    Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

173.    Google has unlawfully tied the Google Play Store to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

174.    Google wields significant economic power in the tying market, the Licensable Smart Mobile OS App Distribution Market. With Google Play Store installed on nearly all licensable OS devices and with it being responsible for over 90 percent of downloads on those devices, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive commissions on the sale of apps through the Google Play Store.

175.    Google only makes the Google Play Store available to those app developers who agree to exclusively process all app-related payments (including in-app purchases) through Google Billing. This tie is especially powerful and effective because Google simultaneously forecloses a developer's ability to use alternative app distribution channels, as described above. Taken together, Google's conduct effectively forces developers to use Google Billing.

176.    The tying product, licensable smart mobile OS app distribution, is distinct from the tied product, licensable smart mobile OS in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of distribution. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

177.    Google's conduct forecloses competition in the Licensable Smart Mobile OS In-App Payment Processing Market, and, in the alternative, in the Licensable Smart Mobile OS Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

-40-

178.     Google has thus engaged in a per se illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

179.     In the alternative only, even if Google's conduct does not constitute a per se illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

180.     Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, they paid more for apps that are compatible with licensable smart mobile OSs and in-app purchases than they would have paid in a competitive market. Plaintiffs was also injured because Google's unlawful monopolization of apps compatible with licensable smart mobile OSs and in-app purchases aftermarket has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiffs was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of apps compatible with licensable smart mobile OSs and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## **COUNT 7**

**California Cartwright Act Unreasonable Restraints of Trade in The
Licensable Smart Mobile OS App Distribution Market
(Against all Defendants except Google Payment)**

181.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

182.     Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. See *id.* §§ 16720, 16726.

-41-

183.     Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

184.     The Licensable Smart Mobile OS App Distribution Market is a relevant antitrust market.

185.     Google has monopoly power in the foregoing market, as evidenced by its high market and its ability to charge a supracompetitive 30 percent commission on the purchase of all apps through the Google Play Store.

186.     Google has executed agreements with OEMs that unreasonably restrict competition in the foregoing market. Google entered into MADAs with OEMs that require OEMs to pre-install and give premium placement to the Google Play Store. These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

187.     Additionally, Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Licensable Smart Mobile OS App Distribution Market.

188.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Device and Network Abuse Policy," Google prohibits developers from distributing apps that download executable code from a source other than Google Play. The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

-42-

189.    Google's conduct has no legitimate or pro-competitive purpose or effect, and unreasonably restrains competition in the Licensable Smart Mobile OS App Distribution Market.

190.    Google's conduct and practices have substantial anticompetitive effects, including increased prices to consumers, reduced innovation, poorer customer service and lowered output.

191.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

192.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs paid supra-competitive prices for apps. Plaintiffs was further deprived of the ability to choose between the Google Play Store and lower cost alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 8

### California Cartwright Act Unreasonable Restraints of Trade in The Licensable Smart Mobile OS App Distribution Market (Against all Defendants except Google Payment)

193.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

194.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. See *id.* §§ 16720, 16726.

195.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

196.    The Licensable Smart Mobile OS App Distribution Market is a valid antitrust market.

-43-

197.    Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Licensable Smart Mobile OS App Distribution Market.

198.    Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Device and Network Abuse" Policy, Google prohibits developers from distributing apps that download executable code from a source other than Google Play. The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

199.    These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Licensable Smart Mobile OS App Distribution Market.

200.    Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

201.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

202.    Plaintiffs has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, they paid more for apps compatible with licensable smart mobile OSs or in-app purchases than they would have paid in a competitive market. Plaintiffs has also been injured because Google's unlawful monopolization of the Licensable Smart Mobile OS App Distribution Market has extinguished Plaintiffs' freedom to choose between the

-44-

Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiffs has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of apps compatible with licensable smart mobile OSs, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 9

### California Cartwright Act Unreasonable Restraints of Trade in Licensable Smart Mobile OS In-App Payment Processing Market
### (Against all Defendants)

203.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

204.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. See *id.* §§ 16720, 16726.

205.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

206.    The Licensable Smart Mobile OS App Distribution Market and Licensable Smart Mobile OS In-App Payment Processing Market, and, in the alternative, the Licensable Smart Mobile OS Games Payment Processing Market, are valid antitrust markets.

207.    Google has monopoly power in the Licensable Smart Mobile OS In-App Payment Processing Market and, in the alternative, in the Licensable Smart Mobile OS Games Payment Processing Market.

208.    Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through certain provisions in these agreements, Google forces app developers to submit to conditions

-45-

that unreasonably restrain competition in the Licensable Smart Mobile OS In-App Payment Processing Market.

209.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases of digital content. Further, compliance with Google's Developer Program Policies, which § 4.1 of the DDA makes obligatory, requires that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of solely "physical products" or of "digital content that may be consumed outside of the app itself," Google expressly applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

210.    The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the Licensable Smart Mobile OS In-App Payment Processing Market and, in the alternative, the Licensable Smart Mobile OS Games Payment Processing Market.

211.    Defendants' conduct affects a substantial volume of interstate as well as foreign commerce.

212.    Defendants' conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

213.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

214.    Plaintiffs has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, they paid more for in-app purchases than they would have paid in a competitive market. Plaintiffs has also been injured because Google's unlawful monopolization of the Licensable Smart Mobile OS In-App Payment Processing Market has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market

-46-

CLASS ACTION COMPLAINT
Case No.:

alternatives that would have been available had Google not monopolized the market. Plaintiffs has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android in-app purchases, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 10

### California Cartwright Act Tying Google Play Store to
### Google Play Billing
### (Against all Defendants)

215.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

216.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition. See *id.* §§ 16720, 16726.

217.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

218.    The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." *Id.* § 16727.

-47-

219.     As detailed above, Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

220.     Google has sufficient economic power in the tying market, the Licensable Smart Mobile OS App Distribution Market, to affect competition in the tied market, the Licensable Smart Mobile OS In-App Payment Processing Market. With Google Play Store installed on nearly all Android OS devices and over 90 percent of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

221.     The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services. Google's foreclosure of alternative app distribution channels forces developers to use Google's in-app payment processing services, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

222.     The tying product, the distribution of apps compatible with licensable smart mobile OSs, is separate and distinct from the tied product, in-app payment processing compatible with licensable smart mobile OSs, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an app compatible with licensable smart mobile OSs is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

223.     Google's conduct forecloses competition in the Licensable Smart Mobile OS In-App Payment Processing Market and, in the alternative, in the Licensable Smart Mobile OS Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

224.     Google has thus engaged in a *per se* tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

-48-

CLASS ACTION COMPLAINT
Case No.:

225.     Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act and therefore illegal.

226.     Google's acts and practices detailed above unreasonably restrained trade in the Licensable Smart Mobile OS In-App Payment Processing Market and, in the alternative, in the Licensable Smart Mobile OS Games Payment Processing Market.

227.     It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

228.     Plaintiffs has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, they paid more for Android apps and in-app purchases than they would have paid in a competitive market. Plaintiffs has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiffs has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## **COUNT 11**

### **ARIZONA UNIFORM STATE ANTITRUST ACT**
### **For Damages and Injunctive Relief**
### **(Against all Defendants)**

229.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

-49-

230.     Google's acts and practices detailed above violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 44-1402, and monopolization or attempted monopolization of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 44-1403.

231.     Google's conduct and practices have substantial anticompetitive effects in Arizona, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

232.     Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 12

### DISTRICT OF COLUMBIA ANTITRUST ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

233.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

234.     Google's acts and practices detailed above violate the District of Columbia Antitrust Act, D.C. Code § 28-4501, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 28-4502, and monopolization or attempted monopolization over any part of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 28-4503.

235.     Google's conduct and practices have substantial anticompetitive effects in the District of Columbia, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

236.     Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 13

### ILLINOIS ANTITRUST ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

237.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in this Complaint as if fully set forth herein.

238.     Google's acts and practices detailed above violate the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 10/3.

239.     Google's conduct and practices have substantial anticompetitive effects in Illinois, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

240.     Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not

engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 14

**IOWA COMPETITION LAW**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

241.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

242.    Google's acts and practices detailed above violate the Iowa Competition Law, Iowa Code § 553.1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce, *id.* § 553.4, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 553.5.

243.    Google's conduct and practices have substantial anticompetitive effects in Iowa, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

244.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

-52-

## COUNT 15

### KANSAS RESTRAINT OF TRADE ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

245. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

246. Google's acts and practices detailed above violate the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, *et seq.*, which prohibits, *inter alia*, combinations to create or carry out restrictions in trade or commerce, increase the price of merchandise, or prevent competition in the sale of merchandise, *id.*

247. Google's conduct and practices have substantial anticompetitive effects in Kansas, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

248. Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 16

### MAINE MONOPOLY & PROFITEERING LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

249. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

250. Google's acts and practices detailed above violate Maine's monopoly and profiteering laws, Me. Rev. Stat. tit. 10, § 1101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of

-53-

trade or commerce, *id.*, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 1102.

251.   Google's conduct and practices have substantial anticompetitive effects in Maine, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

252.   Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 17

### MARYLAND ANTITRUST LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

253.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

254.   Google's acts and practices detailed above violate Maryland's antitrust laws, Md. Code, Com. Law § 11-201, *et seq.*, which prohibit, *inter alia*, combinations that unreasonably restrain trade or commerce, *id.* § 11-204(a)(1), and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce, *id.*, § 11-204(a)(2).

255.   Google's conduct and practices have substantial anticompetitive effects in Maryland, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

256.   Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps

and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 18

### MICHIGAN ANTITRUST REFORM ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

257.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

258.    Google's acts and practices detailed above violate the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 445.772, and the establishment or attempted establishment of a monopoly of trade or commerce for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, *id.* § 445.773.

259.    Google's conduct and practices have substantial anticompetitive effects in Michigan, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

260.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

-55-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT 19

**MINNESOTA ANTITRUST LAW OF 1971**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

261.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

262.    Google's acts and practices detailed above violate the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, which prohibits, *inter alia*, combinations in unreasonable restraint of trade or commerce, *id.* § 325D.51, and the establishment or attempted establishment of a monopoly over any part of trade or commerce for the purpose of affecting competition or controlling, fixing, or maintaining prices, *id.* § 325D.52.

263.    Google's conduct and practices have substantial anticompetitive effects in Minnesota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

264.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT
Case No.:

## COUNT 20

### MISSISSIPPI ANTITRUST LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

265.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

266.     Google's acts and practices detailed above violate Mississippi's antitrust laws, Miss. Code. § 75-21-1, *et seq.*, which prohibit, *inter alia*, combinations inimical to the public welfare that restrain trade, increase the price of a commodity, or reduce the production of a commodity, *id.*

267.     Google's conduct and practices have substantial anticompetitive effects in Mississippi, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

268.     Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 21

### NEBRASKA JUNKIN ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

269.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein

270.     Google's acts and practices detailed above violate the Junkin Act, Neb. Rev. Stat. § 59-801, *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain

trade or commerce, *id.*, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 59-802.

271.   Google's conduct and practices have substantial anticompetitive effects in Nebraska, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

272.   Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 22

### NEVADA UNFAIR TRADE PRACTICES ACT
**For Damages and Injunctive Relief**
**(Against all Defendants)**

273.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

274.   Google's acts and practices detailed above violate the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 598A.060.

275.   Google's conduct and practices have substantial anticompetitive effects in Nevada, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

276.   Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the

-58-

1   Google Play Store and lower cost market alternatives that would have been available had Google not
2   engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages
3   and irreparable injury, and such damages and injury will not abate until an injunction is entered ending
4   Google's anticompetitive conduct.

## COUNT 23

### NEW HAMPSHIRE TRADE AND COMMERCE LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

277.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and
succeeding allegation in the Complaint as if fully set forth herein.

278.   Google's acts and practices detailed above violate New Hampshire's trade and
commerce laws, N.H. Rev. Stat. § 356:1, *et seq.*, which prohibits, *inter alia*, contracts, combinations,
or conspiracies in restraint of trade, *id.*, § 356:2, and the establishment maintenance, or use of
monopoly power, or any attempt to establish, maintain, or use monopoly power for the purpose of
affecting competition or controlling, fixing, or maintaining prices. *Id.* § 356:3.

279.   Google's conduct and practices have substantial anticompetitive effects in New
Hampshire, including increased prices to consumers, reduced innovation, poorer customer service,
and lowered output.

280.   Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the
antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps
and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the
Google Play Store and lower cost market alternatives that would have been available had Google not
engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages
and irreparable injury, and such damages and injury will not abate until an injunction is entered ending
Google's anticompetitive conduct.

-59-

## COUNT 24

**NEW MEXICO ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

281.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

282.   Google's acts and practices detailed above violate the New Mexico Antitrust Act, N.M. Stat. § 57-1-1, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 57-1-2, and combinations in restraint of trade or commerce, *id.* § 57-1-1.

283.   Google's conduct and practices have substantial anticompetitive effects in New Mexico, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

284.   Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 25

**NEW YORK DONNELLY ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

285.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

CLASS ACTION COMPLAINT
Case No.:

286.   Google's acts and practices detailed above violate New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*, which prohibits, *inter alia*, monopoly in the conduct of any business, trade or commerce or in the furnishing of any service, *id.* § 340.

287.   Google's conduct and practices have substantial anticompetitive effects in New York, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

288.   Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 26

### NORTH CAROLINA ANTITRUST LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

289.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

290.   Google's acts and practices detailed above violate North Carolina's antitrust laws, N.C. Gen. Stat. § 75-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 75-1, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 75-2.1.

291.   Google's conduct and practices have substantial anticompetitive effects in North Carolina, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

CLASS ACTION COMPLAINT
Case No.:

292.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 27

### NORTH DAKOTA UNIFORM STATE ANTITRUST ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

293.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

294.    Google's acts and practices detailed above violate the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 51-08.1-02, and the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, *id.* § 51-08.1-03.

295.    Google's conduct and practices have substantial anticompetitive effects in North Dakota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

296.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages

and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 28

### OREGON ANTITRUST LAW
### For Damages and Injunctive Relief
### (Against all Defendants)

297.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

298.    Google's acts and practices detailed above violate the Oregon Antitrust Law, Or. Rev. Stat. § 646.705, *et seq.*, which prohibits, *inter alia*, combinations in restraint of trade or commerce, *id.* § 646.725, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 646.730.

299.    Google's conduct and practices have substantial anticompetitive effects in Oregon, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

300.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT
Case No.:

**COUNT 29**

**SOUTH DAKOTA ANTITRUST LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

301.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

302.    Google's acts and practices detailed above violate South Dakota's antitrust laws, S.D. Codified Laws § 37-1-3.1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and monopolization or attempted monopolization of trade or commerce, *id.* § 37-1-3.2.

303.    Google's conduct and practices have substantial anticompetitive effects in South Dakota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

304.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 30**

**TENNESSEE TRADE PRACTICES ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

305.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

306.    Google's acts and practices detailed above violate the Tennessee Trade Practices Act, Tenn. Code § 47-25-101, et seq., which prohibits, inter alia, combinations designed, or which tend, to

-64-

advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, *id.*

307.    Google's conduct and practices have substantial anticompetitive effect in Tennessee, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

308.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

<h2 style="text-align:center"><strong><u>COUNT 31</u></strong></h2>

<p style="text-align:center"><strong>UTAH ANTITRUST ACT<br>For Damages and Injunctive Relief<br>(Against all Defendants)</strong></p>

309.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

310.    Google's acts and practices detailed above violate the Utah Antitrust Act, Utah Code § 76-10-3101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 7610-3104, and monopolization or attempted monopolization of any part of trade or commerce, *id.*

311.    Google's conduct and practices have substantial anticompetitive effect in Utah, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

312.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the

<div style="text-align:center">-65-</div>

Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 32

### VERMONT CONSUMER PROTECTION LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

313.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

314.    Google's acts and practices detailed above violate Vermont's consumer protection laws, Vt. Stat. tit. 9, § 2451, *et seq.*, which prohibit, *inter alia*, all unfair methods of competition in commerce, *id.* § 2453.

315.    Google's conduct and practices have substantial anticompetitive effects in Vermont, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

316.    Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT
Case No.:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT 33

### WEST VIRGINIA ANTITRUST ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

317.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in this Complaint as if fully set forth herein.

318.   Google's acts and practices detailed above violate West Virginia Antitrust Act, W. Va. Code §§ 47-18-1–47-18-23, which prohibits, *inter alia*, combinations in restraint of trade or commerce, *id.* § 47-18-3, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 47-18-4.

319.   Google's conduct and practices have substantial anticompetitive effects in West Virginia, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

320.   Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 34

### WISCONSIN TRADE REGULATIONS
### For Damages and Injunctive Relief
### (Against all Defendants)

321.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

-67-

322.     Google's acts and practices detailed above violate Wisconsin's trade regulations, Wis. Stat. Ann. § 133.01, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 133.03, and monopolization or attempted monopolization of any part of trade or commerce, *id.* Google's conduct and practices have substantial effects in Wisconsin, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

323.     Plaintiffs was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and in-app purchases. Additionally, Plaintiffs was deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs has suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants and order the following relief:

a. Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

b. Preliminarily and permanently enjoining Defendants from engaging in the wrongful conduct alleged herein;

c. Declaring Defendants' conduct unlawful under the statutes and causes of action alleged herein;

d. Awarding Plaintiffs and the Class treble damages for injuries caused by Defendants' violations of the federal antitrust laws, California's Cartwright Act, the Arizona Uniform State Antitrust Act, the District of Columbia Antitrust Act, the Hawaii antitrust laws, the Illinois Antitrust Act, the Iowa Competition Law, the Kansas Restraint of Trade Act, Maine's monopoly and profiteering laws, Maryland's antitrust laws, Massachusetts' consumer protection laws, the

1  Michigan Antitrust Reform Act, the Minnesota Antitrust Law of 1971, the

2  Mississippi antitrust laws,  Nebraska's Junkin Act, the Nevada Unfair Trade

3  Practices Act, the New Hampshire Consumer Protection Act, the New Mexico

4  Antitrust Act, New York's Donnelly Act, North Carolina's antitrust laws, the

5  North Dakota Uniform State Antitrust Act, the Oregon Antitrust Law, South

6  Dakota's antitrust laws, the Tennessee Trade Practices Act, the Utah Antitrust

7  Act, Vermont's consumer protection laws, the West Virginia Antitrust Act, and

8  Wisconsin's trade regulations; and other monetary relief, including

9  prejudgment and post judgment interest, to the maximum extent permitted by

10  law;

11  e.  Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

12  f.  Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

14  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial

15  of all issues so triable.

Respectfully Submitted,

Dated: October 21, 2020

_Elizabeth C. Pritzker_
Elizabeth C. Pritzker (CA SBN: 146267)
Jonathan K. Levine (CA SBN: 220289)
Bethany Caracuzzo (CA SBN: 190687)
Caroline C. Corbitt (CA SBN: 305492)
**PRITZKER LEVINE LLP**
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
E-mail: ecp@pritzkerlevine.com;
        jkl@pritzkerlevine.com;
        bc@pritzkerlevine.com;
        ccc@pritzkerlevine.com

Heidi M. Silton (*pro hac vice* forthcoming)
Justin R. Erickson (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

-69-

100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
E-mail: hmsilton@locklaw.com
           jrerickson@locklaw.com

*Counsel for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT
Case No.: